LEWIS MATTERO, PLAINTIFF-APPELLANT, v. DAVID SILVERMAN AND WILLIAM WIMBERLY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 29, 1963—Decided June 12, 1963.

Before Judges CONFORD, GAULKIN and KILKENNY.

*Mrs. Janet W. Freeman* argued the cause for the plaintiff (*Mr. Fred Freeman,* attorney).

*Mr. John F. Ryan* argued the cause for the defendants (*Messrs. Ryan, Saros, Davis & Stone,* attorneys).

The opinion of the court was delivered by

GAULKIN, J. A. D. After our previous opinion in this case, reported in 71 *N. J. Super.* 1 (*App. Div.* 1961), certification denied 36 *N. J.* 305 (1962), the case was tried again. After plaintiff rested, the trial court granted defendants' motion for dismissal, on the grounds that plaintiff had not established a *prima facie* case of defendants' negligence and because the evidence showed plaintiff's contributory negligence. Plaintiff appeals.

The broad outlines of the happening of the accident are sufficiently stated in 71 *N. J. Super.,* at *pp.* 5–6.

Plaintiff argues that the evidence of the weather conditions, the huge bulk of the tractor-trailer, its course and position on the highway, and its insufficient lighting was enough to take the issue of defendants' negligence to the jury. We agree.

Taking the evidence and the inferences therefrom in the light most favorable to plaintiff, as we must, the pertinent

circumstances here are that it was not only night, but raining and misty and the visibility was poor; the tractor-trailer was of great bulk, being 40 to 45 feet long and 11 feet high; and defendants drove it diagonally (generally southeasterly) across the three southbound lanes of Route 1, from the diner at the northwesterly corner of Route 1 and Lafayette Street toward the break in the traffic island at the intersection of Lafayette Street; the tractor entered the break in the traffic island, but the trailer extended northwesterly at an angle over all of the southbound lane nearest the traffic island (hereafter the inside lane) and across half the center southbound lane. The side of the trailer and its left rear wheels were in the inside lane and the back of the trailer in the center lane, so that the right rear wheels were 7 or 8 feet in the center lane. The side of the trailer, which thus blocked the inside lane, had no reflectors or lights. Whether there were enough lights else-where on the trailer to warn oncoming traffic that the side of the trailer blocked the inside lane was the issue most sharply disputed at the trial. It was defendants' duty to have "proper lights of sufficient brilliance and volume and properly located on the apparatus as notice or warning * * * to one law-fully using the highway." *Sokiera v. H. A. Jaeger, Inc.,* 12 *N. J. Misc.* 17, 169 *A.* 347 (*Sup. Ct.* 1933), affirmed o. b. 112 *N. J. L.* 500 (*E. & A.* 1934).

Plaintiff was driving a panel truck and following another car, close in front of him, in the inside lane. To his right and a short distance behind, in the center lane, one Hochdorf, a soldier returning to Camp Dix, was driving an automobile in which one Sindlinger was a passenger.

Plaintiff testified that the car in front of him suddenly pulled to the right; "when the car pulled out all I saw was a black object. I went for my brakes * * *"; he saw no lights on this black object.

Hochdorf testified that the weather was "bad, very bad * * * misty * * * it was miserable out," and the visibility was "poor, very poor." He said he saw plaintiff's car in the inside lane, "a little ahead of me on the left"; there

was another car ahead of plaintiff, which suddenly "swerved in front of me and I cursed at him * * * he cut directly to the right all the way over to the third lane * * * and he disappeared * * *." He then testified as follows (emphasis ours):

"QUESTION: Now, when that car went to the right and kept on going did you see the truck and tractor that was stopped on the road? ANSWER: Yes. I was going about 35, around there, and I seen him cut over and I didn't know why because *I couldn't see the truck at all* and then I seen him and I swerved. Well, I just missed him. And I seen him hit and I curved as I was turning.

QUESTION: You saw who hit? ANSWER: The panel truck.

QUESTION: I see. Now, as you pulled to your right after the car in front of the panel truck went to the right, what did the panel truck do? ANSWER: Well, he went into the truck while I was swerving over.

QUESTION: At the same time you were turning? ANSWER: Well, just about the same time, I guess it was.

QUESTION: It says here in the statement 'I pulled to the right and at the same time the truck to my left ran into the side of the truck across the two lanes.' That's true, isn't it? ANSWER: Yes.
* * * * * * * *
QUESTION: And did you notice any lights at all on the side of the tractor-trailer before the accident? ANSWER: *No, there was no lights.*"

Sindlinger corroborated the sudden turn of the car ahead of plaintiff's. He, too, testified that he "didn't notice" the tractor-trailer "until I was almost up on it." He stated that the only lights he observed on the trailer were three reflectors over the rear doors. Those reflectors were facing in the general direction of the diner, and they were high above the pavement. The testimony was that plaintiff had his low beam headlights on. It is therefore likely that plaintiff, traveling in the inside lane, could not have seen the reflection from the reflectors. Sindlinger also testified that plaintiff's brake lights went on before the impact.

Officer Carroll arrived at the scene shortly after the accident and before the tractor-trailer had been moved. He testified:

"Q. What portions of the tractor-trailer did you look at when you arrived at the scene? A. I didn't inspect any portions of the tractor-trailer. As I approached from the north to south we came in from north to south on the accident and stopped our radio car behind the second vehicle, left our light on to avoid a future accident, I observed the scene, the trailer and the panel truck in front of me, and I observed no lights on the tractor-trailer as I observed it.

Q. Did you see the left side of the tractor-trailer? A. A portion of it. The night was a very bad night with the mist and the rain.

THE COURT: You say as you approached it you observed no lights. Did you make an examination at the scene of the trailer?

THE WITNESS: No, not at the scene.

THE COURT: Did you look at it?

THE WITNESS: Yes.

THE COURT: You say there were no headlights and no rear lights?

THE WITNESS: There were no lights on the portion we could see facing us.

THE COURT: What portion would that be?

THE WITNESS: The rear of the trailer, the left side rear.

THE COURT: I am not quibbling with you, Officer. You say there were no lights or you did not see any?

THE WITNESS: I did not notice any."

Officer Carroll was then subjected to extensive examination. It began (emphasis ours):

"Q. You did not mean to testify here this morning, did you, that when you got there that there were no lights on the tractor or trailer? A. I did not mean to testify to this?

MR. FREEMAN: I object to the form of the question.

THE COURT: Let me put it to you this way, Officer. Is it your testimony that there were no lights on the truck?

THE WITNESS: To the best of my knowledge, no, sir.

THE COURT: I want all witnesses to testify to the best of their knowledge. Did you make an observation of the tractor-trailer and the condition of the lights? *Not as you approached, but when you got to the scene.*

THE WITNESS: No, sir, I did not.

THE COURT: Therefore, you may correct me if I am wrong or let me put it this way: Can you testify whether there were lights or whether there were no lights on the tractor-trailer when you got there?

THE WITNESS: *I cannot testify that there were no lights or one light upon examination; only upon my approach to the scene.*

THE COURT: Your approach was from William Street?

The Witness: Yes, sir."

This led to more cross-examination by defense counsel and the court based upon the erroneous presupposition that Carroll's testimony that he observed no lights as he approached the tractor-trailer was worthless unless he looked at the truck, then or later, with the definite purpose in mind to see whether the truck was sufficiently lighted. Carroll, as might be expected, answered repeatedly that he came to the scene because there had been an accident and not to look specifically for any one thing, such as lights, and that his first thought was for the injured. For example, when asked by the court "Were you making an observation as to lights or just a general observation?" he answered, "a general observation"; and to the court's question, "You made no specific observation as to lights *or anything*, did you?" he answered, "No, sir."

 Because of this the trial court rejected Carroll's testimony as of no value. This was error. Carroll's admission that he made no examination of the lights specifically was something to be considered by the jury in weighing his testimony, but it did not make his testimony incompetent or valueless. The observations of witnesses to an accident are not to be rejected simply because they were not the result of a deliberate study of a specific thing. As is said in 5A *Am. Jur., Automobiles and Highway Traffic*, § 1014, *p.* 893:

"Negligence may be established, or the issue of negligence may be raised, by negative as well as positive testimony * * * [t]estimony as to the failure of those in a position to observe to see any light upon the defendant's parked car has been held sufficient to go to the jury upon the issue of the absence of lights."

See also Annotation, 21 *A. L. R.* 2d 7, 70, 116 (1952).

This is especially true when the question is, as it was here, whether there were lights on the vehicle sufficient to alert oncoming traffic. If the lights were only discernible to one looking for them, they were obviously insufficient. To be sufficient, they had to be apparent to the quick eye of the oncoming motorist, who makes a "general" and not a "specific" observation. Here, as we have pointed out, the

lights were not so apparent to plaintiff, or to Hochdorf or Sindlinger, as well as to Carroll.

Detective Atkinson, who examined the tractor-trailer after it had been driven to the side of the road, testified that the left directional light was in working order, but the stop light was not working and the license light was dim.

The adequacy of the lighting was directly related to the due care operation of the vehicle. The lighting may have been so inadequiate that it was defendants' duty not to drive the vehicle on the highway in that weather at all. On the other hand, the lighting may have been sufficient to permit the trailer to operate within its own lane, but not sufficient to permit it to stop diagonally across two lanes, with its dark side toward traffic. In that case, due care may have required defendants to make a right turn off Route 1 to go to east Grand Street or some other intersection where the tractor-trailer could cross Route 1 at a traffic light.

The mere fact (if it were a fact) that the tractor-trailer was equipped with lights sufficient to satisfy the statute would not, standing alone, establish conclusively that defendants had exercised reasonable care in moving and stopping the vehicle as they did with only those lights. 2 *Harper and James, Law of Torts,* § 17.6, *p.* 1014; *Prosser on Torts, c.* 5, § 34, *p.* 163; *Groves v. Meyers,* 35 *Wash. 2d* 403, 213 *P. 2d* 483 (*Wash. Sup. Ct.* 1950); Annotations, 67 *A. L. R. 2d* 130 (1959) and 21 *A. L. R.* 7 (1952).

In short, the question of defendants' negligence was for the jury.

As to plaintiff's contributory negligence, we find that the evidence did not show it so conclusively that dismissal on that ground was warranted. That issue also should have been submitted to the jury.

Plaintiff argues also that the trial court erred in refusing to allow him to call Mr. Russell, a traffic expert, as a witness. Since this question may arise again in the new trial, we shall comment upon it.

Plaintiff's case seemed to be almost completed when plaintiff's counsel requested a recess to await the arrival of Mr. Russell. The trial court thereupon properly requested "a proffer of proof as to what his testimony will be." Counsel's answer was so lacking in detail that one could not determine from it whether the testimony would be admissible. Consequently, we hold that the trial judge did not abuse his discretion in refusing to wait for Mr. Russell to take the stand. However, we do not mean to indicate that Russell should not be permitted to testify at the new trial to those things which plaintiff may show, by being more specific, are matters of expert opinion.

We are advised that the regulations of the Interstate Commerce Commission require side marker lamps and side reflectors on tractor-trailers, and that vehicles with such lighting are approved in New Jersey. It may be that Russell intended to demonstrate with scientific data why side lighting is necessary for a vehicle of this size and shape to be seen by oncoming traffic when positioned as this one was. He may have been prepared to prove that the lighting and reflectors on this vehicle, positioned as it was, could not have served adequately to warn oncoming traffic; or that the standard practice in the trucking industry today is to provide such side lighting; or other matters about which an expert may testify. In short, we leave the matter of such testimony to the trial court upon the new trial.

The judgment is reversed.